UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
NADIA T. TRANTER,                                :

                              Plaintiff,          :          OPINION AND ORDER
                                                              09 Civ. 5133 (GWG)

                   -v.-                            :

MICHAEL J. ASTRUE,                                :

                              Defendants.          :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Nadia Tranter brings this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of the final decision of the Commissioner of Social Security denying her claim

for Supplemental Security Income ("SSI") benefits.  The parties consented to this matter being

decided by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  The Commissioner

and Tranter have moved separately for judgment on the pleadings pursuant to Fed. R. Civ. P.

12(c).  For the reasons stated below, the Commissioner's motion is granted and Tranter's motion

is denied.

I.      BACKGROUND

        A.      Administrative Proceedings

Tranter applied for SSI benefits on March 7, 2007, alleging that she has been unable to

work since February 23, 2005.  See Administrative Record (annexed to Answer, filed Nov. 30,

2009) (Docket # 5) ("R") at 127.  She had previously been employed as a prison outreach

representative, a job she retired from in 2004.  R. 149.  As part of her application, Tranter

submitted records from treating physicians and physical therapists who had been treating her for

an injury to her left arm and shoulder following a car accident in 2005.  See R. 227-681.  She

also underwent examinations by consultative physicians hired by the agency.  See R. 345.

On May 30, 2008, her application was denied.  R. 72-77.  Tranter requested a hearing before an Administrative Law Judge ("ALJ").  R. 81.  The ALJ held an initial hearing on August 12, 2008, see R. 16-55, and a supplemental hearing on December 9, 2008, see R. 56-71.  On December 30, 2008, the ALJ denied Tranter's application.  R. 6-15.  Tranter appealed the decision to the Appeals Council, see R. 5; the council denied her appeal on April 22, 2009, R. 1-4.  She filed the instant action on June 2, 2009.  See Complaint, filed June 2, 2009 (Docket # 1) ("Compl.").

1.      Medical Records

On February 23, 2005, Tranter was involved in a motor vehicle accident in which her car collided with a school bus.  See R. 303.  She was treated in the emergency room of Good Samaritan Hospital and then by Dr. Frank Butera, where she presented with "C-spine and upper thoracic spine tenderness and pain."  R. 303-04.  Dr. Butera's physical examination showed some tenderness and pain in the "left upper extremity"; while he found her shoulder to be "normal," she had "limitation at end range secondary to pain and tenderness."  R. 303.  Her left arm pain was not diagnosed.  See R. 304.  He prescribed her pain medication and recommended physical therapy.  Id.  Tranter began physical therapy in March 2005, which she continued through June 2007.  See R. 248-81, 367-73, 393-429, 521-28, 539.

Tranter returned to Dr. Butera for a check up on March 21, 2005, presenting with pain in her neck, left arm, upper thoracic, and anterior chest region.  R. 302.  She had completed three weeks of physical therapy as of her visit, but reported that it had not improved her condition.  Id.  The physical exam showed that she had spasms in her trapezius muscle, but "maintain[ed] 5 over

2

5 strength" bilaterally in her upper extremities and two over four strength for "reflexes bilateral biceps and triceps tendon."  Id.  Dr. Butera directed her to continue physical therapy and to "avoid any heavy lifting and rotational/repetitive movements with the upper extremities or back."  Id.  An MRI showed "mild degenerative changes at C5-C6 and C6-C7," R. 301, 306,[1] but "no evidence of herniated nucleus pulposus," R. 301.

From March 2005 to December 2005, Tranter had monthly appointments with Dr. Butera.  R. 293-302.  During those visits Dr. Butera's notes reflect that Tranter continued physical therapy, began acupuncture, and showed some improvement, though she continued to present with muscle spasms and tenderness on her left side and arm.  Id.  In an examination on May 17, 2005, Dr. Butera found that notwithstanding her continued tenderness, she was neurovascularly intact.  See R. 299.

On June 17, 2005, Tranter was examined by Dr. Paul G. Jones, an orthopedic surgeon, who found that her "left trapezius and left cervical areas were very tender to light skin touch. Range of motion . . . [was] intact, although grip strength with manual testing was diminished on the left side."  R. 244.  His exam showed evidence of "frozen shoulder" and that she had "very diffuse pain to light touch" around "her entire shoulder girdle."  R. 245.  He recommended that she have a MRI.  Id.  He found that "she was unable to return to work at this time although she" could "carry out her activities of daily living using her right upper extremity."  Id.

On June 24, 2005, Dr. Herbert M. Oestreich conducted an "independent medical examination" of Tranter.  R. 677.  He observed that she "appeared to be a depressed woman who

---

[1] Tranter's subsequent MRI examinations revealed the same result.  See R. 504, 516, 534, 579.

3

was at times tearful." Id.  She explained that moving her left arm and shoulder caused her pain

and restricted her ability to use her arm.  See id.  During the physical exam she "would not

elevate the left arm voluntarily nor would she allow for passive elevation of the left

arm/shoulder." R. 678.  "Individual muscle groups of the lower arm were tested and found to be

normal." Id.  Dr. Oestreich found "no objective neurological deficit" but did find that she

showed "signs of a potential reflex dystrophy[,] or at the very least[,] the beginnings of a frozen

shoulder syndrome." R. 679.  Moreover, "[o]n the basis of the pain" he found that "she is

presently disabled" and that "physical therapy" would be the proper course of treatment.  Id.

Tranter returned to Dr. Butera on August 9, 2005, who found her improved, stating that

"she is to resume all normal activities of daily living with restrictions of no heavy lifting or

repetitive motions . . . ." R. 297.  On August 25, 2005, she returned to Dr. Butera complaining of

"cervical neck pain and pain into her left shoulder with radiation type symptoms" which also

limited her range of motion.  R. 296.  A physical exam revealed that she had "limited range of

motion in forward elevation, external rotation and internal rotation of the left shoulder" and

"[p]ossible early frozen shoulder/rotator cuff pathology." R. 296.  At the next check up, her

"early frozen shoulder" showed signs of improvement and her recent MRI showed her shoulder

to be normal.  R. 295.  Medical records in November and December 2005, reflect that Tranter

was improving slightly, and she admitted to having "good days and bad days." R. 293-94.

Starting on December 13, 2005, Tranter began seeing Dr. Louis M. Starace.  R. 293.  Dr.

Starace found that Tranter was responding well to physical therapy and that she was "grossly

intact neurovascularly, with a continued impression of left shoulder sprain and strain and

cervical spine sprain/strain affecting the left side." Id.

4

In the same month, she also began to see Dr. Walter L. Nieves, a neurologist, who in a letter to Tranter's attorney diagnosed her condition as "post traumatic cervical strain with radical features . . . ."  R. 462, 584.   He reported her strength capacity to be five out of five and that her coordination was "within normal limits on finger/finger and heel/shin/knee.  Rapid alternating movements [were] well performed in the upper and lower extremities.  Fine finger movements [were] well performed" with "some limitations on finger/finger involving the left arm due to limit[ed] motion at the shoulder."  R. 338-39.

Dr. Nieves examined Tranter three more times in January 2006 and multiple times in September and October 2006.  During these visits she continued to complain of shoulder pain. R. 489-95.  Dr. Nieves recorded the following in notes dated January 24, 2006: "shoulder pain ? RSD ? [Reflex Sympathetic Dystrophy] frozen shoulder."  R. 493.  During the same period, Tranter also saw Dr. Starace about once a month with continued complaints of neck and shoulder pain.  See R. 283-92.  During a visit on April 27, 2006, she also reported that after prolonged activity "she occasionally has a shooting pain into the region of her left hand and thumb . . . ." R. 289.

In January 2007, Tranter underwent electro-diagnostic testing.  R. 325, 497-99, 536-38, 536-38, 586-87.  Dr. Rochelle Brief conducted the testing and observed that Tranter did not move her left arm and had restricted movement in her neck but no "trophic changes."  See R. 325.  The testing showed "no indication of a cervical radiculopathy, nerve entrapment syndrome, peripheral neuropathy or myopathy," but Dr. Brief could not "rule out neurological causes of a central origin or RSD."  Id.  She also underwent a bone scan of her head and trunk, the result of which was normal.  See R. 310.  In March 2007, Dr. Nieves switched Tranter from Vicodin to

Skelaxin, see R. 478, which helped decrease some of her arm pain, though she continued to complain of left shoulder pain even with passive motion, see R. 464-77.

On April 2, 2007, Dr. Nieves completed a form for the SSA discussing his treatment and assessment of her physical condition.  R. 326-33.   His diagnosis was "RSD left arm/shoulder" and "cervical damage" based on current symptoms of left shoulder pain and loss of motion in the left shoulder and arm.  Id.   Her condition appeared permanent, see R. 327, and the pain could be alleviated somewhat with medication, see R. 330.  As a result, Tranter was unable to carry, lift, push, or pull with her left arm, but not limited in her ability to stand, walk, or sit.  See R. 332. On April 16, 2007, Dr. Nieves provided a letter to an attorney summarizing Tranter's medical history and treatment.  R. 459-63.   He opined that her coordination and gait were normal and that she appeared "to continue to have post traumatic cervical strain with radicular features associated with right shoulder pain which is associated with a significant reduction in range of motion and which is felt to be consistent with RSD though her bone scans [were] noted to be negative."  R. 462.

Tranter underwent a consultative examination by Dr. Thomas Lin, an agency contracted physician, on April 26, 2007.  Dr. Lin examined Tranter and reviewed her medical records.  R. 341.  He noted that "x-rays did show some degenerative changes of the left shoulder" and that she "would drop eggs and glass because of numbness in her left hand."  Id.  Moreover, his examination found that "[h]and and finger dexterity is intact on the right.  Grip strength is 5/5 on the right.  Grip/grasp is possible but showing give-way weakness of 3 to 4/5 on the left."  R. 342. He noted no muscle atrophy but found "marked limitation on the use of the left upper extremity in reaching high, reaching back, lifting and carrying, also repetitive grip/grasp and fine

manipulation." R. 343.   His ultimate diagnosis was "[d]egenerative changes of the cervical

spine," but he ruled "out degenerative changes of [the] left shoulder joint, RSD." Id.

Tranter was also examined by Dr. Wakeley, an agency medical consultant. R. 345.

Having reviewed her medical records, he opined that she was able to "sit 6 of 8 hours,

stand/walk 6 of 8 hours, [and] lift a maximum of 20 pounds using [her] left arm as a helper arm."

R. 345.

On May 15, 2007, Dr. Nieves opined in a handwritten note that Tranter's "limitations are

limited to her arms due to left shoulder RSD and the resulting loss of range of motion at this

shoulder." R. 349.  Moreover, he noted that "lifting, carrying, pushing, pulling could make the

condition worse," but that her condition does not limit her ability to sit, stand, or walk.  R. 349.

The next medical report, dated July 31, 2007, from Dr. Barry S. Kraushaar, found

Tranter very hesitant to move her left arm or to have him examine it.  R. 544.  He noted that she

could slowly open and close her left hand and that she does it in a "clawing type of motion as she

appears to move methodically when she moves her left hand."  Id.  He prescribed her a TENS

unit – a form of electric nerve stimulation used for pain relief – and recommended that she try

swimming or aqua therapy.  See id.  During a follow up visit on September 4, 2007, Dr.

Kraushaar discussed pain management and Tranter noted some progress from physical therapy.

R. 543.  His continued diagnosis was "RSD[,] scapular sprain and cervical sprain."  Id.

On September 11, 2007, Dr. Kraushaar completed a Medical Source Statement of Ability

to Do Work-Related Activities.  R. 376-79.  He found Tranter could occasionally lift or carry 20

pounds and frequently lift or carry 10 pounds.  R. 376.  While she had no limitations standing or

walking, he found that she could not push or pull with her upper extremities because of "RSD

7

and pain in her" left arm.  R. 376-77.   Because she could not "control her left arm or move/use it

effectively," she could not climb, crouch or crawl, but she could occasionally balance and kneel.

Id. at 377.  Finally, he opined that because of her left shoulder and arm limitations she could not

reach for or handle objects, but her ability to feel or finely manipulate was unlimited.  See R.

379.

    In the following two months, Tranter reported some improvements and setbacks to Dr.

Kraushaar.  R. 541, 555.  Additionally, Tranter continued to report pain on her left side during

examinations with Dr. Nieves from January 2008 through June 2008; Dr. Nieves' diagnosis

remained the same.  R. 440-50.  Likewise, Dr. Kraushaar checked in with Tranter by phone and

recorded in his notes that she continued to have stiffness in her left shoulder and recommended

that she undergo another MRI.  See R. 550.

    Dr. Jeffery Oppenheim performed "an independent neurosurgical evaluation" of Tranter

on May 29, 2008.  R. 662.  He reviewed Tranter's extensive medical history, see R. 662-64, and

performed his own examination, see R. 664-66.  Tranter alleged that she was "unable to use . . .

[her] left arm for activities . . . she previously enjoyed, such as hunting or playing golf, [and that]

she holds [the left arm] close to her body but" can "drive [an automobile] by using her right arm

with her left arm assisting only by holding the undersurface of the steering wheel," otherwise

movement will cause pain radiating in her neck and shoulder.  R. 664-65.  His examination

revealed "no trophic changes in the arm[,] . . . no warmth[, and] . . . no evidence of muscle

atrophy."  R. 665.  She "resists any attempt to try and move her left shoulder or flex or extend

her left elbow."  Id.  He also found that "grip strength in the left hand reveals only giveway

weakness as does long finger extension and flexion."  Id.  These actions "induce neck pain"

which Dr. Oppenheim characterized as a "non-physiological finding."  Id.  He could not provide

any "neurological reason why" Tranter had giveway and weakness in her left hand and fingers,

and thus concluded that there was "no physiological basis" for Tranter's "specific complaints

and certainly no evidence of structural injury that could have been sustained at the accident."  Id.

He also found no evidence of RSD because such a condition would have resulted in "troph[ic]

changes, temperature changes, and changes in the nail beds" after two years.  Id.  Furthermore,

he questioned Tranter's entire story, "as she insisted that she broke her teeth in the accident and

yet the ER record shows that she did not even strike her head[,]" and noted that RSD was

unlikely when she did not present with "significant neck or neurological findings" in the

emergency room.  R. 666.  Finally, Dr. Oppenheim "reject[ed] entirely [RSD] as the working

diagnosis for this patient" because Tranter exhibited "no neurological deficits causally related to

the accident in question or related to any structural injury at that accident that would justify a

diagnosis at this time."  Id.

On June 18, 2008, Dr. Nieves completed a second medical source statement of Tranter's

ability to perform work-related activities.  See 431-37.  He opined that Tranter could not "use

[her] left arm due to shoulder pain," R. 431, but could occasionally handle, frequently finger, and

continuously feel with her left hand, R. 433.  He also recorded that she remained able to "sort,

handle, [and] use paper/files."  R. 436.  While she could continuously use either foot, she was

unable to climb stairs or ramps, climb ladders or scaffolds, balance, stoop, kneel, crouch, or

crawl.  R. 433-34.  She could not tolerate exposure to unprotected heights, moving mechanical

parts, extreme heat or cold, and vibrations, but could handle humidity, wetness, dust, and fumes.

R. 435.

9

2.      Hearing

On August 12, 2008, ALJ Katherine Edgell held a hearing to decide whether Tranter's

circumstances qualified her for SSI benefits.  See R. 16-55.  Tranter appeared and was

represented by counsel.  R. 18.  She testified that she was born on November 20, 1947, was at

the time 60 years old, and held the equivalent of a bachelor's degree.  R. 19-21.  She remained

able to drive a car and is right-handed.  R. 20.  At the time, her symptoms were pain in her neck,

left shoulder, left arm, and upper back, which had persisted since her car accident on February

23, 2005.  R. 38.  She was taking Skelaxin, Lyrica, and Valium, which helped her pain

"somewhat" and she was continuing physical therapy.  See R. 38-39.

On a typical day, Tranter woke up at around 6:00 a.m. and drove to church services

located about a mile away, after which she drove to her mother's house and remained there with

her disabled mother until 10:00 p.m.  See R. 42-44.  Her husband had to help dress her in the

mornings.  R. 42.  She could still do "light dusting" but other household chores like vacuuming,

mopping, and shopping were done by her husband.  R. 44-45.  Tranter could pay bills and write

checks.  R. 45.  She had difficulty sleeping due to her pain and slept three to four hours a night

on average.  Id.

Tranter testified that she remained able to carry and lift items weighing between 5 to 10

pounds and to perform fine hand manipulation with her right arm and hand.  R. 47.  She testified

that she could not use her left arm and hand to carry or lift.  R. 47-48.  Moreover, she could not

sit for longer than 30 minutes but she could occasionally stand for longer periods of time.  R. 48.

Sitting at a desk and writing for too long caused her pain.  See R. 51.  She could type on a

computer if she used her right hand.  See R. 50.  She testified that she held her left arm in front

of her body, by her stomach, to avoid pain.  R. 49.

Prior to retiring Tranter was a state employee working with psychiatric patients and conducting prison outreach.  R. 21, 28-30.  Her work involved public speaking, counseling, report writing, and general office work.  R. 21-22.  Between 1999 and 2004, she gave lectures on alcohol and drug abuse in prisons and coordinated admissions to drug treatment programs.  R. 22-23.  In that job, Tranter would travel to prisons three times a month for lectures and would spend the remaining time interviewing inmates by telephone and making recommendations for enrollment.  See R. 23-26.  She wrote notes and screening letters on the computer.  R. 26.  She spent about two and a half to three hours on the phone screening inmates and approximately four hours writing on the computer.  R. 27.  Otherwise, her job entailed little lifting or carrying except customary office tasks, such as moving books or operating a Xerox machine.  R. 27-28.  Her previous position as a drug treatment admissions coordinator, which she held from 1996 to 1999, involved similar tasks.  See R. 28-30.  Prior to that, she worked as a case manager at Rockland Psychiatric Center where she helped clients attend medical and psychiatric appointments and manage their daily lives.  R. 30-31.  She had to maintain reports of her visits which she wrote by hand in the car and later input into a computer.  R. 32.

On December 9, 2008, the ALJ held a second hearing to hear testimony from a vocational expert, Donald Slive.  R. 58, 66-71.  He categorized her past relevant work as sedentary and testified that someone of Tranter's age, education, and work history could not perform her past work if she had difficulty manipulating her fingers on both hands because the tasks "would require a great deal of keyboarding which would mean that an individual would need bilateral dexterity."  R. 66-67.  Later in his testimony, Slive explained that "one would need fine

11

manipulation" as opposed to gross manipulation to use a keyboard.  R. 69.   Slive testified that

an individual matching Tranter's profile, who could not lift or carry with her left arm, was

limited to sitting or standing for six to eight hours a day, but if able to perform fine manipulation

with either hand, could resume her past relevant work.  R. 67-69.

> 3.   ALJ Decision

The ALJ issued her decision on December 30, 2008, ruling that Tranter did not qualify

for disability benefits.  R. 9-15.  Her findings of fact and conclusions of law are as follows:

> 1) The claimant meets the insured status requirement of the Social Security Act
> through December 31, 2009.
>
> 2) The claimant has not engaged in substantial gainful activity since February 23,
> 2005, the alleged onset date (20 CFR 404.1571 et seq.).
>
> 3) The claimant has the following severe impairments: degenerative disc disease
> of the cervical spine with disc herniation at C5-6; frozen shoulder with RSD and
> strains of cervical and thoracic spine (20 CFR 404.1521 et seq.).
>
> 4) The claimant does not have an impairment or combination of impairments that
> meet or medically equals one of the listed impairments in 20 CFR Part 404,
> Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).
>
> 5) After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform light work as defined in
> 20 CFR 404.1567(b) except she cannot perform lifting, carrying, pushing, pulling
> or overhead reaching with the left, non-dominant upper extremity.  She can
> perform occasional gross manipulation and frequent fingering and feeling with
> her left hand and is unlimited in the right.
> . . .
> 6) Claimant is capable of performing past relevant work as a counselor and case
> worker.  The work does not require the performance of work-related activities
> precluded by the claimant's residual functional capacity (20 CFR 404.1565).
> . . .
> 7) The claimant has not been under a disability, as defined in the Social Security
> Act, from February 23, 2005 through the date of this decision (20 CFR
> 404.1520(f)).

R. 11-15.

The ALJ provided a detailed explanation of her reasoning to support her findings under point five above.  R. 11-14.  Based on her review of the medical records, the ALJ determined that there was sufficient evidence to find that the conditions diagnosed "could have reasonably caused the symptoms alleged."  R. 14.  However, the ALJ found that "claimant's symptoms are not of such intensity, frequency or duration as to preclude substantial gainful activity."  Id. Although Tranter had been diagnosed with "degenerative disc disease of the cervical spine," the severity of the diagnosis was mitigated by the fact that: 1) Tranter had not undergone surgery for the condition; 2) Tranter had responded positively to physical therapy; 3) EMG studies showed no evidence of radiculopathy or neuropathy; and 4) MRI and EMG tests did not show evidence of frozen shoulder syndrome, though the initial MRI showed "mild degenerative changes."  Id. Moreover, "[m]ultiple treating physicians . . . opined that the claimant could perform a range of light work with limitations in use of the left upper extremity with no limitations in fingering or feeling."  Id.  Finally, the ALJ noted that Tranter's own "allegations of disabling impairments are unsupported by her own statements and actions.  The claimant testified that she is able to drive every day to" church, do "light household chores and . . . sit and read to her elderly mother."  Id. She discounted the reports by Dr. Jones and Dr. Oestreich, who opined that Tranter was disabled, because "they are non-specific in nature and not supported by the medical evidence or . . . examination findings which showed no neurological deficits."  Id.  Moreover, she found these reports inconsistent with "opinions of the treating physicians, who are afforded controlling weight . . . ."  R. 14.

Under point six, the ALJ relied on the testimony of the vocational expert who testified that Tranter's past relevant work was "sedentary."  R. 15.  She pointed to his testimony that a

person in Tranter's circumstances "could return to this work as long as the person could perform fine manipulation skills with both hands." Id. The ALJ then noted that Tranter's "treating physicians opined that the claimant could perform such fine manipulation." Id. Accordingly, the ALJ found that Tranter could perform the "physical and mental demands of this work." Id.

     B.    Procedural History

On June 2, 2009, Tranter filed her complaint seeking review of the ALJ decision. See Compl. On November 30, 2009, the Government filed a motion for judgment on the pleadings. See Notice of Motion, filed Nov. 30, 2009 (Docket # 6); Defendant's Memorandum of Law in Support of His Motion for Judgment on the Pleadings, filed Nov. 30, 2009 (Docket # 7). Tranter responded with a cross-motion for judgment on the pleadings. See Notice of Motion, filed Mar. 12, 2010 (Docket # 12); Plaintiff's Memorandum of Law in Support of Her Motion for Judgment on the Pleadings, filed Mar. 12, 2010 (Docket # 13) ("Pl. Mem."). The Government filed a reply memorandum. See Defendant's Reply Memorandum of Law in Support of His Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Cross-Motion for Judgment on the Pleadings, filed Feb. 22, 2010 (Docket # 11).

II.    DISCUSSION

     A.    Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner must determine whether the Commissioner has applied the correct legal standard and whether the decision is supported by substantial evidence. See, e.g., Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); Acierno v. Barnhart, 475 F.3d 77 80-81 (2d Cir. 2007) (citing Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004)), cert. denied, 551 U.S. 1132 (2007); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999);

see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to

any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence"

is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971)

(quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d

at 127-28; Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d

126, 131 (2d Cir. 2000).

   "Even where the administrative record may also adequately support contrary findings on

particular issues, the ALJ's factual findings must be given conclusive effect so long as they are

supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation

and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds substantial evidence

to support the Commissioner's final decision, that decision must be upheld, even if substantial

evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d

444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where

there is substantial evidence to support either position, the determination is one to be made by

the factfinder.")).  "The role of the reviewing court is therefore quite limited and substantial

deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454

(citations and internal quotation marks omitted).  The reviewing court may not substitute its

judgment for that of the Commissioner; further, it may reverse the administrative determination

"only when it does not rest on adequate findings sustained by evidence having 'rational

probative force.'" Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)

(quoting Consol. Edison Co., 305 U.S. at 230).

15

B.     Standard Governing Evaluations of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person

will be found to be disabled only if it is determined that his "impairments are of such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the

national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the

objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective

evidence of pain or disability testified to by the claimant or others; and (4) the claimant's

educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that

the Commissioner must follow in evaluating a disability claim.  See 20 C.F.R. § 404.1520(a)(4);

see also Burgess, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner

must determine whether the claimant is currently engaged in any "substantial gainful activity."

20 C.F.R. § 404.1520(a)(4)(i).  Second, if the claimant is not engaged in substantial gainful

activity, the Commissioner must decide if the claimant has a "severe medically determinable

physical or mental impairment," 20 C.F.R. § 404.1520(a)(4)(ii), which is an impairment or

combination of impairments that "significantly limits [the claimant's] physical or mental ability

16

to do basic work activities . . . ."  20 C.F.R. § 404.1520(c).  Third, if the claimant's impairment is

severe and is listed in 20 C.F.R. Part 404, Subpt. P, App. 1, or is equivalent to one of those

listed, the claimant must be found disabled regardless of his age, education, or work experience.

See 20 C.F.R. § 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment is not listed and is not

equal to one of the listed impairments, the Commissioner must review the claimant's residual

functional capacity to determine if the claimant is able to do work he or she has done in the past,

i.e., "past relevant work."  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant is able to do such

work, he or she is not disabled.  Id.  Finally, if the claimant is unable to perform past relevant

work, the Commissioner must decide if the claimant's residual functional capacity permits the

claimant to do other work.  See 20 C.F.R. § 404.1520(a)(4)(v).  If the claimant cannot perform

other work, he or she will be deemed disabled.  Id.  The claimant bears the burden of proof on all

steps except the final one – that is, proving that there is other work the claimant can perform.

See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

    Tranter objects to the ALJ's ruling on the following grounds: 1) the ALJ misinterpreted

Slive's testimony;  2) the ALJ failed to consider Tranter's "advanced age;" and 3) the ALJ

mistakenly found that Tranter was capable of performing "light work."  Pl. Mem. at 1-5.  None

of these three grounds, however, provides a basis for reversing the ALJ's decision.  We discuss

each separately.

        1.          Whether the ALJ Misinterpreted the Vocational Expert's Testimony

    It is difficult to understand precisely what ground Tranter is advancing with respect to

Slive's testimony.  Tranter quotes the testimony, asserts that the ALJ "misinterpreted th[e]

testimony," and concludes that she committed error because "the ALJ based her decision, at least

in part[,]" on the testimony.  Pl. Mem. at 2.  Tranter gives no indication as to how or in what way the ALJ misinterpreted the testimony.  Accordingly, her challenge to the ALJ's alleged use of the testimony must necessarily fail for this reason alone.  In any event, there is no indication that the ALJ misinterpreted the testimony.  In her decision, the ALJ stated that Slive testified that Tranter's

> past relevant work as a counselor . . and case worker . . . were sedentary and skilled work with transferable skills.  The vocational expert testified that such a person could return to this work as long as the person could perform fine manipulation skills with both hands.

R. 15.

The record reflects that Slive testified that the jobs of counselor and case worker involved "sedentary" work and that the "skills" were transferable.  R. 66.  He also testified that if there are "no limits in manipulative," the person could perform the work of a counselor or case worker. R. 68.  Accordingly, the ALJ did not misinterpret Slive's testimony in deciding this case, and thus Tranter's argument on this ground is rejected.

### 2.   Whether the ALJ Failed to Take Tranter's Age into Account

Tranter argues that the ALJ failed to properly account for her age when deciding whether she qualified for disability benefits.  See Pl. Mem. at 3.  Based on the cases cited, Tranter seems to be relying on 20 C.F.R. § 404.1563(e) and 20 C.F.R. § 404.1568(d), which impose a higher burden for finding that an applicant age 55 or older has the residual capacity to perform other work available in the national market place.  See 20 C.F.R. § 404.1568(d)(4).  This regulation, however, applies only when considering the fifth step of the disability analysis – that is, where the agency attempts to show that the claimant possesses vocational skills transferable to other types of employment in the event the claimant is unable to resume his or her prior work.  See

Draegert v. Barnhart, 311 F.3d 468, 472-73 (2d Cir. 2002) (Commissioner failed to take proper account of applicant's age and skills in attempting to prove that the claimant "had vocational skills that were transferable to other jobs"). Here, by contrast, the ALJ's decision denying Tranter benefits was premised on her finding that Tranter retained the ability to resume her prior work, see R. 13-15, not based on the conclusion that Tranter remains capable of performing "other work," see 20 C.F.R. § 404.1520(a)(4)(v). As a result, Tranter's argument is rejected because the ALJ was not required to account for her age in deciding whether she was able to resume her prior work.

   3. <u>Whether the ALJ Committed an Error in Finding Tranter Capable of "Light Work"</u>

  Tranter attacks the ALJ's finding that she was able to perform "light work." Pl. Mem. at 3-5. The ALJ's findings, however, contained an important exception. Specifically, the ALJ found that Tranter had "the residual functional capacity to perform light work as defined in 20 CFR [§] 404.1567(b), <u>except she cannot perform lifting, carrying, pushing, pulling or overhead reaching with the left, non-dominant upper extremity</u>. She can perform occasional gross manipulation and frequent fingering and feeling with her left hand and is unlimited in the right." R. 11 (emphasis added).[2] Tranter attacks this finding on the ground that it is allegedly

---

  [2] Federal regulations define "light work" as follows:

  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine

inconsistent with the opinion of Dr. Nieves, <u>see</u> Pl. Mem. at 4, who found that she could not lift

or carry more than 10 pounds, <u>see</u> R. 431.  Tranter invokes the "treating physician rule," which

dictates that a treating physician's opinion is entitled to controlling weight if it is

"well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence . . . ."  20 C.F.R. § 404.1527(d)(2).  Nonetheless,

under this rule, the Commissioner is not required to give deference to the treating physician's

opinion where the treating physician "issued opinions that are not consistent with other

substantial evidence in the record, such as the opinions of other medical experts."  <u>Halloran v.</u>

<u>Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004); <u>accord</u> <u>Burgess</u>, 537 F.3d at 128.

Tranter's challenge must be rejected for two reasons.  First, in reaching the conclusion

that Tranter could perform her past relevant work, the ALJ accepted Slive's testimony that

Tranter's past work was "sedentary" – a lower threshold than "light work."  <u>See</u> 20 C.F.R.

§ 404.1567(a)-(b).  Thus, Tranter's ability to perform "light work" was irrelevant to the ALJ's

ultimate conclusion.

Second, there was substantial evidence to support the finding that Tranter retained the

ability to carry, lift, push, pull, and reach with her right arm to a degree that meets the definition

of "light work."  As an initial matter, Dr. Nieves's completion of the form suggests that his

responses were based exclusively on Tranter's inability to use her left arm and shoulder, <u>see</u> R.

431 ("unable to use left arm due to shoulder pain"); the responses do not suggest that Dr. Nieves

made any conclusions with respect to her use of her right arm.  In any event, another of

---

dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b)

plaintiff's treating physicians, Dr. Kraushaar, stated in his report that Tranter was able to lift or carry up to 20 pounds occasionally, and that she could frequently lift or carry 10 pounds.  See R. 376.  This report provides evidentiary support from a treating physician that contradicted Dr. Nieves's unexplained conclusion, and thus the ALJ was entitled to rely on it.

Conclusion

For the foregoing reasons, the Government's motion for judgment on the pleadings (Docket # 6) is granted and Tranter's cross-motion (Docket # 12) is denied.  The Clerk is requested to enter judgment dismissing this case.

SO ORDERED.

Dated:  October 20, 2010
           New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Barry I. Weiss
Freedman, Wagner, Tabakman & Weiss
130 North Main Street
Suite 202
New City, NY 10956

John E. Gura, Jr.
Assistant United States Attorney
86 Chambers Street
New York, NY 10007

plaintiff's treating physicians, Dr. Kraushaar, stated in his report that Tranter was able to lift or carry up to 20 pounds occasionally, and that she could frequently lift or carry 10 pounds. See R. 376. This report provides evidentiary support from a treating physician that contradicted Dr. Nieves's unexplained conclusion, and thus the ALJ was entitled to rely on it.

Conclusion

For the foregoing reasons, the Government's motion for judgment on the pleadings (Docket # 6) is granted and Tranter's cross-motion (Docket # 12) is denied. The Clerk is requested to enter judgment dismissing this case.

SO ORDERED.

Dated: October 20, 2010
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Barry I. Weiss
Freedman, Wagner, Tabakman & Weiss
130 North Main Street
Suite 202
New City, NY 10956

John E. Gura, Jr.
Assistant United States Attorney
86 Chambers Street
New York, NY 10007